431 F.2d 1215
 AMERICAN BANK OF WAGE CLAIMS, Appellant,
v.
REGISTRY OF the DISTRICT COURT OF GUAM, Appellee.
NATIONAL WESTERN LIFE INSURANCE COMPANY, Appellant,
v.
REGISTRY OF the DISTRICT COURT OF GUAM, Appellee.
 No. 22711.
 No. 22854.
 United States Court of Appeals, Ninth Circuit.
 September 21, 1970.
 
 1
 Eugene H. Bramhall (argued), W. Scott Barrett, Walter S. Ferenz, of Barrett, Ferenz & Bramhall, Agana, Guam and Oakland, Cal., for appellants.
 
 
 2
 Allan J. Weiss (argued), Atty., Admiralty & Shipping Section, San Francisco, Cal., John F. Meadows, Atty., Admiralty & Shipping Dept., U. S. Dept. of Justice, Washington, D. C., James P. Alger, U. S. Atty., Duane K. Crase, Acting U. S. Atty., Harold Burnett, Atty. Gen. of Guam, Agana, Guam, for appellee.
 
 
 3
 Before HUFSTEDLER and KILKENNY, Circuit Judges, and PENCE,* District Judge.
 
 PENCE, District Judge:
 
 4
 These actions, consolidated on appeal, are two of at least seven related cases filed in the District Court of Guam, sitting in admiralty, arising out of the misfortunes of the M/S Galveston Navigator. Appellants, American Bank of Wage Claims (American Bank) and National Western Life Insurance Company (National Western), appeal from orders of the trial court relating to the assignment of priority to admiralty claims and the payment of those claims in the order of their assigned priority, to appellants' financial loss. Appellee, the United States, in addition to direct response to the appeals, has moved under Fed.R. App.P. 27 to dismiss these consolidated appeals for lack of in rem jurisdiction. Appellee's motion to dismiss was consolidated for argument with the hearing on the appeals.
 
 
 5
 A chronological history is necessary to clarify even partially the present posture of these appeals.
 
 
 6
 About October 31, 1966, the Galveston Navigator, S.A., agreed with the United States to provide the United States with a freighter for a voyage from a United States Gulf port to a "safe port" in South Viet Nam. Pursuant to the voyage charter the Galveston Navigator, registered under the flag of Panama, was loaded with approximately 4500 long tons of rice, and it sailed for Viet Nam about November 17, 1966.
 
 
 7
 In late January 1967, the Galveston Navigator developed engine trouble and broke down midway between Wake Island and Guam. In response to her urgent request, she was towed to Guam about February 2, 1967.
 
 
 8
 Thereafter, as she lay dead in the harbor, certain services were extended to and work performed on her, giving rise to several precustodial liens in admiralty. Nonpayment of these liens then spawned a number of separate suits in the District of Guam, pursuant to which the vessel was seized by warrant of arrest. Thereafter, with those liens still unreleased, and the vessel apparently abandoned by its owners, on May 26, 1967, the United States filed suit for damages and also caused the vessel to be arrested on that same day. Then on June 27, 1967, Western Life filed its complaint as a preferred foreign mortgagee, and the Galveston Navigator was again arrested on July 1, 1967.
 
 
 9
 On August 14, 1967, the United States filed a motion for the interlocutory sale of the vessel and the removal of the rice thereon. The district court granted this motion on August 28, 1967, finding that the presence of approximately 4500 tons of perishable cargo, then on board, would adversely affect the salability of the vessel, to the detriment of all parties who had filed liens. Accordingly, the district court authorized the United States Marshal to discharge the cargo, charge the cost thereof against the proceeds of the sale of the ship as an administrative expense, and the vessel was ordered to be sold.
 
 
 10
 At that same August 28, 1967 hearing the district court further ordered, in the related admiralty cases concerning the same vessel, that "the above listed actions and any actions which may be filed hereafter shall be consolidated for the purpose of further proceedings and the allowance of claims on the basis of priority."
 
 
 11
 After the rice was removed, the vessel was sold for $140,500 and the sale was confirmed on October 23, 1967. The cost of the presale removal of the rice cargo aboard the Galveston Navigator was $65,819.94. On November 2, 1967, the United States moved for payment of fees and costs in the sum of $89,275.74, which sum included the costs of offloading as well as other postcustodial claims. The motion was granted at a hearing on November 9, 1967. Immediately after that ruling, on November 9, 1967, all counsel met and exchanged documentation in order to establish dollar amounts and priority of their respective liens against the balance of $51,224.26 remaining in the Registry after the payment, on that same day, of the United States claim, supra.
 
 
 12
 On December 14, 1967, American Bank filed its suit for recovery of wages advanced by its assignor in the months of May, June and July, 1966 — but there is no record of any service of process on the defendant. On December 15, 1967, American Bank filed a motion for consolidation based upon the order of the district court on August 28, 1967.
 
 
 13
 Various objections to the dollar amounts or priority were thereafter filed with the Guam court. On December 22, 1967, a hearing was held on all objections then filed to the various liens, at which time certain priorities and dollar amounts were established. Also, at this hearing, American Bank's motion for consolidation was denied. On January 22, 1968, American Bank noted an appeal from the December 22, 1967, denial of its motion to consolidate.
 
 
 14
 On February 2, 1968, the court below, acting pursuant to its determination of December 22, 1967, paid additional claims from the funds remaining in the Registry in the following amounts:
 
 
 15
 . . . Jones & Guerrero . . . $15,714.57; Gov't of Guam . . . $3,203.11; U.S. Navy . . . $8,432.99; Atkings Kroll . . . $2,493.03; for publication — $276.75; wages of crew to June 1, 1967 — $3,000 approximately; costs of rehabilitating, repatriating the members of the crew — $7,650.00; Theo. H. Davis . . . $2,796.79.
 
 
 16
 It was not until following this February 2 order, that Western Life on the same day noted an appeal from both the November 2, 1967 order disbursing the $89,275.74 to the United States and the February 2, 1968 order of disbursement.
 
 
 17
 Then, on March 13, 1968, the district entered its final decree and ordered the funds then remaining in the Registry to be paid to Western Life. Thus, thereafter there were no more funds in the Registry of the District Court of Guam.
 
 
 18
 It is important to note that although American Bank on January 22, 1968, noticed its appeal from the district court's order of December 22, 1967, no stay of execution of that order was sought, no supersedeas bond filed, nor any other action attempted to keep the funds in the Registry intact pending appeal. The same absence of action holds true for Western Life with respect to the orders of November 9, 1967 and February 2, 1968.
 
 
 19
 Because our ruling upon the government's motion to dismiss these appeals for lack of in rem jurisdiction is dispositive of the cases, we concern ourselves only with the legal aspects of that motion.
 
 
 20
 It is axiomatic that in rem jurisdiction exists in an action only where the subject matter of the action, or an appropriate substitute thereof, is within the jurisdiction of the court in which the action lies. This general principle applies in admiralty.[1] Thus, where a vessel is the target of an in rem action in admiralty, it must both be within the territorial jurisdiction of court hearing the cause and subject to the order of the court through process of arrest. The proceeds from the judicial sale of a vessel, or security furnished in lieu thereof, are deemed a jurisdictional substitute for the vessel itself.[2]
 
 
 21
 The government asserts that the logical corollary to this rule is: where the res has been finally and completely released from the jurisdiction of the court and no stay has been requested nor bond filed, then, even if subsequently the order of release were reversed, nothing would remain within the court's control over which it could assert in rem jurisdiction, therefore any order concerning the res would be but an empty gesture, and in rem jurisdiction could not be asserted. Applied to the facts of this case, the government urges, this means that when on March 13, 1968, the proceeds from the sale of the Galveston Navigator had been finally and completely distributed, the Guam court (and ergo now this court) was divested of in rem jurisdiction.
 
 
 22
 Appellants, on the other hand, contend that if the proceeds of a sale of a vessel have a situs for in rem jurisdiction while in the Registry of the district court, then those same proceeds, even after disbursement, must have a situs for purposes of continued in rem jurisdiction. They insist (without supporting citations) that once in rem jurisdiction is gained by the court, it is somehow a continuing status, notwithstanding an order of release of the res and the failure to stay the execution thereof through the filing of a superedeas bond, culminating in the physical release of the res.
 
 
 23
 The strong weight of authority, however, is on the side of the government. This court, with others, has held that in an in rem admiralty proceeding where a vessel is the res and no stay of execution has been applied for, the release or removal of the vessel from the jurisdiction of the court destroys in rem jurisdiction and renders moot any appeal from decisions of the trial court concerning the vessel.[3]
 
 
 24
 Appellants, nevertheless, urge that this court retains jurisdiction because if those who took under the district court's orders of distribution can be found within its jurisdiction they may be compelled to repay funds into the Registry, thereby re-establishing in rem jurisdiction.
 
 
 25
 While a court may compel the return of a vessel accidentally, fraudulently or improperly removed from its jurisdiction, The Rio Grande, 90 U.S. (23 Wall.) 458, 23 L.Ed. 158 (1874), no such or even similar facts here appear. In the Rio Grande, bond was posted and a stay of execution was in effect. Removal of the vessel under these circumstances was held to be "improper." Here, no stay of execution was in effect when the funds in the Registry were completely disbursed, to appellants' full knowledge, and appellants have failed to allege any other facts which give rise to the accident, fraud, or impropriety mentioned in the Rio Grande. Moreover, the res in the present case was a fund of monies, distributed to many parties, rather than a single vessel as in the Rio Grande. If remanded to the district court to recover the "res," that court would become entangled in an elaborate exercise in tracing, identifying, recovering and then redistributing any recovered monies to no less than seven contentious litigants — an effort caused solely by appellants' failure to take timely and legal steps to prevent the final disbursement.
 
 
 26
 The district court is not now obligated so to act, nor are we inclined or required so to order it.[4] Furthermore, even if ultimately the distributees were successfully determined and located, nevertheless ordering repayment of funds into the Registry would, under the circumstances of this case, implicitly erase the distinction between in personam and in rem jurisdiction and work an unprecedented extension of the latter.
 
 
 27
 Appellants, having taken no action whatsoever to stay execution of the judgment below,[5] are now precluded from enjoying their rights of appeal from the final decision of the district court.
 
 
 28
 Appellee's motion to dismiss these appeals for lack of in rem jurisdiction is granted, and the appeals stand dismissed.
 
 
 
 Notes:
 
 
 *
 Honorable Martin Pence, United States District Judge, District of Hawaii, sitting by designation
 
 
 [1]
 See Rule C(2), Supplemental Rules for Certain Admiralty and Maritime Claims, 28 U.S.C
 
 
 [2]
 See United States v. Ames, 99 U.S. 35, 36, 25 L.Ed. 295 (1878); The Charles D. Leffler, 100 F.2d 759, 760 (3 Cir. 1938);cf. Rule F(9), Supplemental Rules for Certain Admiralty and Maritime Claims, 28 U.S.C.
 
 
 [3]
 See,e. g., Martin v. The Bud, 172 F.2d 295, 296-297 (9 Cir. 1949) (vessel removed from territorial jurisdiction of court); Parks v. B. F. Leaman & Sons, Inc., 279 F.2d 529 (5 Cir. 1960) (same); see also The Manuel Arnus, 141 F.2d 585 (5 Cir.), cert. denied, 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584 (1944) (vessel released from seizure); The Denny, 127 F.2d 404 (3 Cir. 1942) (vessel removed from territorial jurisdiction of court); Canal Street Works, Inc. v. One Drag Line Dredge, 48 F.2d 212 (5 Cir.), cert. denied, 284 U.S. 647, 52 S.Ct. 29, 76 L.Ed. 550 (1931) (vessel released from seizure).
 
 
 [4]
 Cf. The Dode, 100 F. 478 (D.Wash. 1900).
 
 
 [5]
 See Fed.R.Civ.P. 62